IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

JUDY WHITE and GARY WHITE,      )
                                         )

    Plaintiffs,                   )
                                         )

vs.                                    )     **CIVIL ACTION NO.:**
                                       )    _____

MARY M. MITCHELL, both personally )
and in her official capacity;        )
WILLIAM MACKELBURG, both     )
personally and in his official capacity;  )
KENNETH ATKINSON, both personally )
and in his official capacity;        )
REX BLOCKER, both personally and  )
in his official capacity;           )
LEIGH STONE RYAN, both personally )
and in her official capacity;        )
LUISA FUERTES ROSARIO, both    )
personally and in her official capacity; )
VALARIE KEPNER, both personally  )
and in her official capacity;        )
[Initial Unknown] KELSO, both     )
personally and in his official capacity;  )
WILLIAM ANDERSON, both personally )
and in his official capacity;        )
[Initial Unknown] CARTER, both    )
Personally and in her official capacity;  )
VALERIE WILKINS, both personally  )
and in her official capacity;        )
M. F. HUGER, both personally and   )
in her official capacity;           )
PIERRE MOREAU, both personally and )
in his official capacity;           )
B. INGRAM, both personally and    )
in his official capacity;           )
[Initial Unknown] LANDY, both     )
personally and in his official capacity;  )
WILLIAM MAHOMES, both personally )

and in his official capacity;                          )
LISA SUNDERMAN, both personally      )
and in her official capacity;                         )
JENIFER GRUNDY HOLLETT, both       )
personally and in her official capacity;      )
JORDAN HOLLETT, both personally     )
and in his official capacity;                          )
SANDRA K. LATHROP, both personally )
and in her official capacity;                         )
[Initial Unknown] FINNERTY, both        )
personally and in his official capacity;       )
ROBERT SWANSON, both personally     )
and in his official capacity;                          )
JOHN BYRD, both personally and in his  )
official capacity;                                          )
[Initial Unknown] SANTIAGO, both        )
personally and in his official capacity;       )
HENRY M. HERLONG, JR., both            )
personally and in his official capacity;       )
KEVIN F. MCDONALD, both personally  )
and in his official capacity;                          )
BILL NETTLES, both personally and in    )
his official capacity;                                     )
DEFENDANTS A through Z, and             )
AA through ZZ being those                     )
persons or entities that participated in      )
any manner whatsoever and/or                 )
conspired in any manner whatsoever,        )
whether directly or indirectly, regardless )
of knowledge aforehand, in any act or      )
omission relative to the events made the   )
basis of the Plaintiffs' Complaint, all of   )
whom are unknown at the time of the        )
filing of the Plaintiffs' Complaint but       )
will be added by amendment  when           )
ascertained;                                                )
EDGEFIELD FEDERAL PRISON;            )
THE SOUTHEAST REGIONAL                )
OFFICE OF THE FEDERAL BUREAU    )
OF PRISONS; THE FEDERAL               )

| | |
|---|---|
| **BUREAU OF PRISONS;** | ) |
| **ATTORNEY GENERAL ERIC** | ) |
| **HOLDER, both personally and in his** | ) |
| **official capacity;** | ) |
| **UNITED STATES DEPARTMENT OF** | ) |
| **JUSTICE;** | ) |
| **THE PRESIDENT OF THE UNITED** | ) |
| **STATES, BARACK HUSSEIN OBAMA;** | ) |
| | ) |
| **Defendants.** | ) |

## COMPLAINT

COME NOW the Plaintiffs, Judy White and Gary White, *pro se,* and respectfully state and show unto this Honorable Court their Complaint against the Defendants as follows:

## THE PLAINTIFFS

1.    The Plaintiff Judy White (hereinafter, "Mrs. White" or, collectively, "Plaintiffs") is a resident citizen of Jefferson County, Alabama and was at all times during the events made the basis of the Plaintiff's Complaint.  The acts and events made the basis of the Plaintiffs' Complaint are believed to have primarily occurred in or about Edgefield County, SC; Atlanta, Georgia; Washington, DC; and Greenville, SC; the injuries to the Plaintiffs were primarily inflicted in or about Jefferson County, AL; Edgefield County, SC; Atlanta, GA; Oklahoma City, OK; Memphis and Millington, TN and in transit at all points between.

2.    The Plaintiff Gary White (hereinafter, "Mr. White" or, collectively, "Plaintiffs") is a resident citizen of Jefferson County, Alabama and was at all times during the events made the basis of the Plaintiff's Complaint. He was formerly imprisoned at the federal prison in Edgefield, South Carolina from September 29, 2010 until December 28, 2011. The acts and events made the basis of the Plaintiffs' Complaint are believed to have primarily occurred in or about Edgefield County, SC; Atlanta, Georgia; Washington, DC; and Greenville, SC; the injuries to the Plaintiffs were primarily inflicted in or about Jefferson County, AL; Edgefield County, SC; Atlanta, GA; Oklahoma City, OK; Memphis and Millington, TN and in transit at all points between.

## THE DEFENDANTS

**For all Defendants:** Upon information and belief of the Plaintiffs, the acts and events made the basis of the Plaintiffs' Complaint are believed to have primarily occurred in or about Edgefield County, SC; Atlanta, Georgia; Washington, DC; and Greenville, SC; the injuries to the Plaintiffs were primarily inflicted in or about Jefferson County, AL; Edgefield County, SC; Atlanta, GA; Oklahoma City, OK; Memphis and Millington, TN and in transit at all points between.

3.      Defendant Mary M. Mitchell (hereinafter, "Mitchell") at some of the time during the events made the basis of the Plaintiffs' Complaint was the warden of the federal prison in Edgefield, South Carolina.  Mitchell, upon information and belief, is now employed by the Federal Bureau of Prisons (hereinafter, "BOP") in Washington, DC.  On Friday, January 7, 2011, William Mackelburg stated that Mitchell remained the warden despite her absence from the prison and the state of South Carolina; her "signature" continued to be affixed to documents, letters, and official actions.  Mitchell is made a Defendant both personally and in her official capacity.

4.      Defendant William Mackelburg (hereinafter, "Mackelburg") is and at all times during the events made the basis of the Plaintiffs' Complaint was an administrator at the prison camp of the federal prison in Edgefield, South Carolina. Mackelburg is made a Defendant both personally and in his official capacity.

5.      Defendant Kenneth Atkinson (hereinafter, "Atkinson") became the warden in or about January, 2011 and at some of the time during the events made the basis of the Plaintiffs' Complaint was the warden of the federal prison in Edgefield, South Carolina.  Atkinson is made a Defendant both personally and in his official capacity.

6.    Defendant Rex Blocker (hereinafter, "Blocker"), during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was the medical doctor responsible for medical care at the prison camp of the federal prison in Edgefield, South Carolina. Blocker is made a Defendant both personally and in his official capacity.

7.    Defendant Leigh Stone Ryan (hereinafter, "Ryan"), during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was a physician's assistant responsible for medical care at the prison camp of the federal prison in Edgefield, South Carolina. Ryan is made a Defendant both personally and in her official capacity.

8.    Defendant Luisa Fuertes Rosario (hereinafter, "Rosario"), during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was a prison medical employee responsible for medical care at the prison camp of the federal prison in Edgefield, South Carolina.  Rosario is made a Defendant both personally and in her official capacity.

9.    Defendant Valarie Kepner (hereinafter, "Kepner") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was an administrator with duties and

responsibilities at the prison camp of the federal prison in Edgefield, South Carolina. Kepner is made a Defendant both personally and in her official capacity.

10.    Defendant [Initial Unknown] Kelso (hereinafter, "Kelso") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was an employee with duties and responsibilities at the prison camp of the federal prison in Edgefield, South Carolina. Kelso is made a Defendant both personally and in his official capacity.

11.    Defendant William Anderson (hereinafter, "Anderson") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was an employee with duties and responsibilities at the prison camp of the federal prison in Edgefield, South Carolina. Anderson is made a Defendant both personally and in his official capacity.

12.    Defendant [Initial Unknown] Carter (hereinafter, "Carter") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was an employee with duties and responsibilities at the prison camp of the federal prison in Edgefield, South Carolina. Carter is made a Defendant both personally and in her official capacity.

13.    Defendant Valerie Wilkins (hereinafter, "Wilkins") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was an employee with duties and responsibilities at the prison camp of the federal prison in Edgefield, South Carolina.    Wilkins is made a Defendant both personally and in her official capacity.

14.    Defendant M. F. Huger (hereinafter, "Huger") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was an employee with duties and responsibilities at the prison camp of the federal prison in Edgefield, South Carolina.  Huger is made a Defendant both personally and in her official capacity.

15.    Defendant Pierre Moreau (hereinafter, "Moreau") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was an employee with duties and responsibilities at the prison camp of the federal prison in Edgefield, South Carolina.  Moreau is made a Defendant both personally and in his official capacity.

16.    Defendant B. Ingram (hereinafter, "Ingram") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was an employee with duties and

responsibilities at the prison camp of the federal prison in Edgefield, South Carolina. Ingram is made a Defendant both personally and in his official capacity.

17.    Defendant Landy (hereinafter, "Landy") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was an employee with duties and responsibilities at the prison camp of the federal prison in Edgefield, South Carolina. Landy is made a Defendant both personally and in his official capacity.

18.    Defendant William Mahomes (hereinafter, "Mahomes") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was an employee with duties and responsibilities at the prison camp of the federal prison in Edgefield, South Carolina.  Mahomes is made a Defendant both personally and in his official capacity.

19.    Defendant Lisa Sunderman (hereinafter, "Sunderman") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was regional counsel for the Southeast Regional Office ("SERO") with duties and responsibilities for the prison camp of the federal prison in Edgefield, South Carolina.  Sunderman is made a Defendant

both personally and in her official capacity.

20.    Defendant Jenifer Grundy Hollett (hereinafter, "female Hollett") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was employed as prison attorney with duties and responsibilities at the federal prison in Edgefield, South Carolina. Female Hollett is made a Defendant both personally and in her official capacity.

21.    Defendant Jordan Hollett (hereinafter, "male Hollett") is the husband of Female Hollett and during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was employed as prison employee with duties and responsibilities at the federal prison in Edgefield, South Carolina. Male Hollett is made a Defendant both personally and in his official capacity.

22.    Defendant Sandra K. Lathrop (hereinafter, "Lathrop") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was employed as a prison employee with duties and responsibilities at the federal prison in Edgefield, South Carolina; she "acted" as DHO is a sham hearing although she was clearly not qualified to do

so. Lathrop is made a Defendant both personally and in her official capacity.

23.    Defendant Finnerty (hereinafter, "Finnerty") during the period September 29, 2012 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was employed as a prison employee with duties and responsibilities at the federal prison in Edgefield, South Carolina. Finnerty is made a Defendant both personally and in his official capacity.

24.    Defendant Robert Swanson (hereinafter, "Swanson") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was employed as a prison employee with duties and responsibilities at the federal prison in Edgefield, South Carolina. Swanson is made a Defendant both personally and in his official capacity.

25.    Defendant John Byrd (hereinafter, "Byrd") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was employed as a prison employee with duties and responsibilities at the federal prison in Edgefield, South Carolina. Byrd is made a Defendant both personally and in his official capacity.

26.    Defendant Santiago (hereinafter, "Santiago") during the period September 29, 2010 through December 28, 2011, during some of the events made

the basis of the Plaintiff's Complaint was employed as a prison employee with duties and responsibilities at the federal prison in Edgefield, South Carolina. Santiago is made a Defendant both personally and in his official capacity.

27.     Defendant Henry M. Herlong, Jr. (hereinafter, "Herlong") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was a federal judge with duties and responsibilities for the fair, unbiased administration of justice in Greenville, South Carolina.    Herlong is made a Defendant both personally and in his official capacity.

28.     Defendant Kevin F. McDonald (hereinafter, "McDonald") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was a federal magistrate judge with duties and responsibilities for the fair, unbiased administration of justice in Greenville, South Carolina, having previously worked as the federal prosecutor to convict the imprisoned plaintiffs with whose cases he was entrusted.  McDonald is made a Defendant both personally and in his official capacity.

29.     Bill Nettles (hereinafter, "Nettles") during the period September 29, 2010 through December 28, 2011, during some of the events made the basis of the Plaintiff's Complaint was U.S. Attorney for the District of South Carolina with

duties and responsibilities for the fair, unbiased administration of justice in South Carolina. Nettles is made a Defendant both personally and in his official capacity.

30.    Defendant Edgefield Federal Prison (hereinafter, "Prison") is located in Edgefield County, South Carolina, and is the location where many of the acts and events made the basis of the Plaintiffs' Complaint originated and where the prison employee defendants are or were employed, conspired and acted, causing harm and injury to the Plaintiffs.

31.    Defendant Southeast Regional Office of the Federal Bureau of Prisons (hereinafter, "SERO") is located in Atlanta, Georgia.    SERO has oversight responsibility for the Prison and its employees.

32.    Defendant Federal Bureau of Prisons (hereinafter, "BOP") is located in Washington, DC.    BOP has oversight responsibility for SERO and its employees, and the Prison and its employees.

33.    Defendant Eric Holder (hereinafter, "Holder") is and was the Attorney General, located in Washington, DC.  Holder has oversight responsibility for the Department of Justice (DOJ), the BOP, SERO, the Prison and their employees.

34.    Defendant Department of Justice (hereinafter, "DOJ") is located in Washington, DC.  DOJ has oversight responsibility for the BOP, SERO, the Prison

and their employees.

35.     Defendant Barack Hussein Obama (hereinafter, "Obama") is the President of the United States, appointed Holder, and has oversight responsibility for Holder, the DOJ, the BOP, SERO, the Prison and their employees.

36.     Fictitious Defendants A through Z are those persons or entities that participated in any manner whatsoever and/or conspired in any manner whatsoever, whether directly or indirectly, regardless of knowledge aforehand, in any act or omission relative to the events made the basis of the Plaintiff's Complaint all of whom are unknown at the time of the filing of Plaintiffs' Complaint but will be added by amendment when ascertained.

## INCORPORATION

37.     **CIVIL ACTION NO. 8:11-144-HMH-KFM IS INCORPORATED IN ITS ENTIRETY BY REFERENCE AS IF FULLY SET FORTH HEREIN, INCLUDING EACH AND EVERY ATTACHMENT, AMENDMENT, MOTION, AND PLEADING.**

## FACTUAL ALLEGATIONS

38.     The Plaintiffs reallege and reassert each and every material allegation contained in each preceding paragraph and incorporate them by reference as if

fully set out herein.

39.    The Defendants have engaged in a pattern and practice of harassment, abuse, torture, terrorism, criminal deprivation of civil rights under color of law, violation of civil rights, including, in particular, the constitutional guarantees prohibiting cruel and unusual punishment, rights to access to counsel and exercise of legal rights, free speech, due process, equal protection, and other violations resulting in severe harm and injury of the Plaintiffs.

40.    Defendants wrongfully, without due process and in violation of equal protection, terminated Mrs. White's visitation rights, both social for six (6) months and legal permanently, citing her wearing of a green dress on Christmas, even though the remedy for any dress violation is denial of entry until the objectionable attire is changed.   During the same and exact period of Mrs. White's illegal punishment, a visitor to the prison tested positive for exposure to heroin; she was denied entry and suspended from visiting for forty-eight (48) hours with a warning that a subsequent positive test result showing exposure to heroin could result in the loss of visitation for thirty (30) days, or one month.  Mrs. White's wearing of the green dress was deemed by the Defendants to be ninety (90) times more dangerous than the visitor testing positive for exposure to heroin; Mrs. White's wearing of the green dress was deemed by the Defendants to be six (6) times more dangerous than

a second positive exposure to heroin would have been. During the entire period of September 29, 2010 until December 28, 2011, visitors at the Prison were admitted while wearing green, with no adverse consequences whatsoever, thereby irrefutably establishing the disparate treatment of Mrs. White by the Defendants. In reality, Mrs. White's punishment had nothing to do with her attire, but was the result of Defendants' First Amendment retaliation for Mrs. White's actions making known the conditions of Mr. White's confinement and the abuse to which both Plaintiffs have been subjected. The Defendants actions inflicted severe harm and injury against the Plaintiffs and were criminal deprivation of civil rights under color of law.

41.    The Defendants, also without due process or equal protection, and as First Amendment retaliation, illegally terminated telephone communications between the Plaintiffs for six (6) months, inflicting severe harm and injury against both Plaintiffs, and committing criminal deprivation of civil rights under color of law against the Plaintiffs. Defendant Lathrop, unqualified under BOP rules, nevertheless presided as DHO, despite having animosity toward Mr. White and Mrs. White. Defendant Lathrop was in charge of the prison mailroom, and was and had been the source of numerous complaints by both Mr. and Mrs. White due to the illegal criminal interference with mail between the Whites, including the wrongful theft, destruction, disappearance, rejection, delay and interference with

mail, books, crafts and other permissible items attempted to be sent between Mr. and Mrs. White. In addition to complaints within the prison system, Mrs. White had filed formal complaints with the U.S. Postal Inspector, due to the illegal acts by prison mailroom Defendants. Defendant Lathrop was known to be angry with Mr. White, even prior to meeting him, at which time she said, "So … you are Gary White" in a derogatory manner. Even so, she wrongfully acted as DHO on the false and fabricated charge filed by Defendant Anderson, carrying out the threats made by Defendant Mackelburg and Defendant Kelso. The week of the sham hearing, in which Defendant Lathrop failed and refused to follow procedure and allow witnesses for Mr. White and stated to Mrs. White at the onset that Mr. White was guilty of Defendant Anderson's fabricated charge, Defendant Mackelburg announced Defendant Lathrop's promotion, from a position in which she failed miserably and was paid over $74,000 per year, to a position in which she was paid over $80,000 per year. Defendant Carter was likewise promoted by Mackelburg after delivering threats to Mr. White on Veteran's Day, 2010, giving the clear message that prison employees who carried out Defendant Mackelburg's threats against the Whites would be handsomely financially rewarded.

42.   The Defendants continued to illegally and dangerously withhold Mr. White's required prescription medication, thereby causing severe harm and injury to him and to Mrs. White, who lived in constant terror of Mr. White's death or

severe harm and injury due to the withholding.

43.    The Plaintiffs desperately begged for assistance and intervention from the Prison administration, Mitchell, Atkinson, SERO, the BOP, DOJ, Holder, Obama, and they filed suit, including seeking emergency relief, where Defendants Herlong and McDonald refused their pleas and sat idly by, along with each and every other Defendant with oversight responsibility, while the prison employee Defendants continued to threaten and carry out threats against the Plaintiffs, causing severe harm and injury to them.   Egregiously, the judicial Defendants wrongfully erected barriers and established unmeetable conditions for the Plaintiffs access to the court for redress of their grievances.

44.    Mr. and Mrs. White continued to communicate by mail and the prison's limited e-mail system, and they continued to pursue administrative remedies regarding the threats, abuses and violations by prison employees.  Mrs. White continued to speak out in interviews and make known the conditions at the Prison through letters, faxes, telephone calls, and other means.

45.    The prison Defendants wrongfully and in violation of BOP rules accommodated service of an out-of-district non-party subpoena for deposition and interfered with and obstructed Mr. White's rights to protect himself and his legal interests and Mrs. White's assistance in opposition to the subpoena.   The party seeking to depose Mr. White was the Securities and Exchange Commission (SEC)

with the subject being matters of which Mr. White had no information. Additionally, Mr. White was and continues to appeal his wrongful prosecution and conviction that resulted in his false imprisonment. Despite Mr. White notifying all concerned that he had no information, could not and would not testify, and invoking his right to remain silent exercising the rights and protections under the Fifth Amendment, the Defendants wrongfully worked with the SEC in obstructing and violating Mr. White's rights and in violation of BOP rules and federal rules of civil procedure.

46.    On or about March 24, 2011, Mr. White was taken from his prison job in the law library and locked in solitary confinement (the SHU), without due process and without being given a reason for this barbaric punishment. Mr. White was denied and deprived of his eyeglasses, his Bible, a pillow, a calendar, a watch, a usable toothbrush or other personal hygiene necessities, a usable writing implement, stamps, paper, envelopes, any and all personal belongings, and other items and necessities guaranteed to be provided in BOP Program Statements and the C.F.R., and he was held in a cold, dark and damp black mold-infested concrete-enclosed cell without being able to see outside or beyond the concrete walls. His privacy was violated, being denied and deprived of a screen or curtain for toileting and/or showering, at which time prison employees, including female prison employees would openly watch him. He was denied and deprived of clean

clothing, bed linens and towels. In violation of his civil rights, he was obstructed, denied and deprived of his legal rights in opposing the subpoena for deposition; he was obstructed, denied and deprived of his legal rights in prosecuting the aforementioned civil lawsuit against the prison Defendants; he was denied and deprived of the exercise of religious practices during the Lenten period; he was denied and deprived of exercise and even the guaranteed one-hour daily time outside the cell; he was denied and deprived of access to the law library; his requests for administrative remedy forms and efforts to pursue appeals were refused by prison employees. Mr. White was denied and deprived of sleep, as prison employees would go through the solitary confinement facility at night banging a sledge-hammer against steel bars, jolting him from sleep, causing sleep deprivation and traumatizing, terrorizing, and torturing him. At night and at times during the days, Mr. White was subjected to horrific sounds of prisoners in agony, screaming, crying, begging and pleading for help, as well as the sounds of the prison employees laughing gleefully in response.

47.     On Friday, March 25, 2011, Mr. White had a legal telephone call with his attorney. Mr. White was handcuffed and shackled, with his hands in handcuffs behind his back prior to being removed from the cell, said conditions remaining throughout the legal call and until he was returned to the cell. Defendants Huger and Moreau, after hand-cuffing and shackling Mr. White, moved him into an office

area, where they remained throughout the legal call, with Huger holding the telephone to Mr. White's ear, hearing everything Mr. White said and likely hearing what his attorney said. Defendant Finnerty was also present. Defendants Huger, Moreau, and Finnerty willfully and knowingly violated Mr. White's legal privilege and attorney-client confidentiality, as well as willfully and knowingly violating federal law, BOP policy and procedure. When Mr. White's attorney later confronted Defendant Huger about the violation, she stated she was following orders, without specifying the source of the orders.

48. On every occasion he had interaction with a prison employee, Mr. White repeated his question: Why am I here? He was told variously that he was there for his own protection, that he was under investigation, that he would not be told and that he could and would be held as long as the prison employees chose, that they did not have to give him a reason. On one single occasion, a prison employee responded truthfully, stating, "You made someone mad." Locking Mr. White in solitary confinement was retaliatory and criminal deprivation of civil rights under color of law; it inflicted severe harm and injury on the Plaintiffs; it violated the Plaintiffs' Eighth, First, Sixth, Fourteenth Amendment and other rights and protections under federal law; it was the Defendants' intentional infliction of emotional distress and it was outrageous.

49.    While Mr. White was in solitary confinement (the SHU), Defendant Mackelburg responded to Mr. White's question of why he was there with, "What did you expect – filing all those complaints?"  Defendant Mackelburg's statement provides clear evidence that Mr. White's illegal solitary confinement was unwarranted and retaliatory in nature, resulting in severe harm and injury of Mr. White as well as Mrs. White.

50.    On Mr. White's twentieth (20th) day in solitary confinement, he met for the first time with Defendant Santiago, in violation of BOP policies and procedures requiring an initial hearing with 24 hours and frequent communications with prisoners who have been locked in the SHU without due process or a hearing of any sort.  On Day 20, Defendant Santiago told Mr. White he had been held "for an investigation" regarding his request for a legal call, that the investigation had been completed, that he had been found to have committed no violation whatsoever, and that he would be returned to his housing unit at the prison camp. BOP rules require that when a prisoner who is held without hearing is found to have committed no violation, the prisoner must be immediately released from the SHU.  Yet Mr. White, even after the acknowledgement that he had committed no violation, was held an additional seven (7) days, with the torture, terrorism, abuse and violation of his rights continuing, causing severe harm and injury to Mr. White and also to Mrs. White.

51.    As the result of efforts by Mrs. White and Mr. White's pursuit of administrative remedies, the Prison was compelled to restore Mrs. White's visitation rights in April, after almost four months of the illegal violations by the Defendants, and while Mr. White was being illegally held in solitary confinement. The Defendants, in particular, female Hollett, failed and refused to convey or notify Mrs. White of the restoration of her rights, thereby causing her to be constructively and illegally denied visitation.    She was belatedly notified immediately following the end of designated visitation time on Friday, when her parents had gone to visit Mr. White.  The actions by the Defendants caused severe harm and injury to the Plaintiffs.

52.    Due to the illegal actions of the Defendants in preventing her from visiting her husband, Mrs. White requested and was granted permission to visit him the following day, during regular visitation time at the FCI, where medium-security prisoners are held.  Mrs. White was severely traumatized and shocked, after leaving home in the middle of the night, travelling alone 300 miles from the Whites' home in Alabama to the prison, only to be restricted to seeing her husband through a glass and concrete wall, and limited to speaking with him by telephone. While the medium-security prisoners and their visitors in the adjacent area were able to embrace, kiss, and have direct contact, Mr. and Mrs. White were denied and deprived of such, even though Mr. White had committed no violation of any rule

and was a minimum-security prisoner illegally locked in solitary confinement in retaliation for the Whites' exercise of their First Amendment rights. When Mrs. White demanded to know why she was being denied the visit to which she was entitled and that had been approved for her, the prison employee told her that Mr. White, a 64-year old man with no criminal record who had committed no violation, was a threat and dangerous to the medium-security prisoners and their visitors, causing outrage, severe harm and injury to the Whites. It was during that visit that Mrs. White learned that a book she had sent to Mr. White based on Psalm 91 had not been given to him, although other items sent in the same mailer had been, evidencing the prison employees' theft of the book.

53.    During Mr. White's illegal solitary confinement, Defendant female Hollett illegally induced and unduly influenced Mr. White to sign documents after he had submitted a written statement revoking all prior signatures, consents and authorizations, and stated in writing that he would not sign documents without the documents and proposed correspondence being first reviewed by his attorney. Defendant female Hollett, Defendant Mackelburg, and Defendant Mitchell had engaged in a pattern and practice of preparing and sending false, fabricated and falsified responses to members of the U.S. Senate and House of Representatives, and other inquiries made regarding the violations and abuse of Mr. White and his wife. These actions by the Defendants caused severe harm and injury to the

Plaintiffs.

54.    Defendant male Hollett was an active participant in the abuse of Mr. White while he was illegally in solitary confinement as well as the abuse of Mrs. White, including laughing aloud at her during her desperate calls trying to find her husband and upon her later visits to her husband, causing severe harm and injury to both Plaintiffs.

55.    After twenty-seven (27) days, Mr. White was moved from solitary confinement back to the prison camp, where his housing unit had been reassigned and he had been fired from his job in the prison library, both recognized and identified as disciplinary actions, making them illegal, as no disciplinary action was appropriate and no violation had been committed by Mr. White. Notably, shortly before he was locked in solitary confinement, Defendant Mackelburg had asked Mr. White, in attempting to dissuade him from filing complaints and pursuing administrative remedies as required under the Prison Litigation Reform Act ("PLRA"), "Do you like your job?" This question by Defendant Mackelburg occurred as Mackelburg, the designated administrative remedy coordinator for the prison camp, was addressing Mr. White's requests for administrative remedy, giving Mr. White the clear understanding that Defendant Mackelburg was threatening him with loss of his job. Mr. White's job loss subjected him to severe harm and injury, including loss of income, along with Mrs. White.

56.    Mr. White's removal from illegal solitary confinement was timed to coincide with the SEC's deposition, which Defendants Herlong and McDonald had failed and refused to act properly in recognition of Mr. White's rights.  The prison Defendants failed and refused to allow Mr. White legal counsel or legal assistance, despite his requests and those of his attorney.  On the day of the deposition, Mr. White was denied and deprived of both breakfast and lunch, he was forced against his will, despite his objections and assertions of legal rights and privileges, and in violation of federal prison and federal court rules and procedures, to submit to a deposition that was, in itself, abusive and harassing, thereby causing serious harm and injury to Mr. White.  These events were orchestrated by Defendant female Hollett, who illegally interjected herself and participated in the deposition and abuse of Mr. White.

57.    The Plaintiffs later learned that Defendant Huger, who had committed criminal deprivation of civil rights under color of law against Mr. White, was the reason for Mr. White being illegally locked in solitary confinement, due to her preparation of a false and fabricated report against Mr. White.

58.    Defendant Mahomes subsequently prepared a separate and additional false and fabricated report against Mr. White, threatening him with additional solitary confinement and reassignment to a higher security prison, based upon the Defendants' obsession with blocking and preventing Mr. and Mrs. White's

communications.

59.    Defendant female Hollett committed defamation and libeled Mrs. White.  Female Hollett is licensed to practice law in California, but not in South Carolina.  South Carolina bar rules state that it is a criminal violation to engage in the practice of law within the state without being admitted to practice and a member of the South Carolina bar.  California bar rules identify unauthorized practice in other jurisdictions as a violation of California bar rules, and state that no California licensee may practice in a jurisdiction that requires bar membership without first obtaining such membership.  The Whites filed bar complaints in both South Carolina and California for female Hollett's violations of both states' rules and requirements.  In retaliation, female Hollett defamed and libeled Mrs. White by writing and mailing at government expense four certified letters to Mrs. White's employers, falsely stating that Mrs. White had committed violations of attorney-client privilege in e-mail communications with Mr. White.  Female Hollett went so far as to fabricate and blatantly lie regarding the essence, content, and context of such communications and misrepresented Mrs. White's correspondence with her husband, giving Mrs. White's attorney employers specific dates of the alleged violations and telling them that they could request and receive the correspondence between Mr. and Mrs. White.  Female Hollett's actions, in addition to defaming and libeling Mrs. White, caused her severe harm and injury, outrage, humiliation,

tortiously interfered with a business relationship, and caused her to have undue fear and concern based upon interference with or loss of her job and the income on which she relies to support herself and her family.

60.    Defendant Blocker, Defendant Ryan and Defendant Rosario all had a duty to properly and promptly attend to the medical needs of Mr. White. Each failed and refused to fulfill his/her duties, instead willfully withholding needed medical care and treatment, and including withholding of Mr. White's needed prescription medications. The prison medical defendants engaged in an illegal pattern and practice of violation of Mr. White's (and other prisoners') Eighth Amendment rights, committing medical abuse and medical malpractice against Mr. White over the period of September 29, 2010 through December 28, 2011. All of Mr. White's prescription medications were taken and withheld upon his self-surrender to the Prison; he was given no medication whatsoever for three days, endangering his life and health and exposing him to the known risks of sudden cessation, in violation of BOP written policies and procedures and the requirements of the C.F.R. The prison medical defendants repeatedly refused to see Mr. White, refused to address his medical needs, illegally restricted him to asking one question per visit, locked him in the medical area without access to a restroom and when he made them aware he needed to use the restroom, refused to unlock the door to the restroom in the medical area and allow Mr. White to use it,

even though the Defendants had been made aware that their withholding of his needed medication had caused his known prostate disease to be aggravated and exacerbated, resulting in very frequent urination and pain. On one occasion, the prison medical Defendants' locking Mr. White in the medical area and refusal to allow him to use the restroom resulted in him soiling himself. On a separate occasion, Mr. White was told he could leave the locked medical area and return to his distant housing unit to use the restroom, which he did, only to be refused entry upon his return. These actions by the Defendants were acts of intentional infliction of emotional distress, physical distress, extreme humiliation, harm and injury of Mr. White.

61.    The prison medical Defendants and/or other Defendants falsified and fabricated Mr. White's medical records, both to cover up their wrong-doing and prevent and obstruct Mr. White's legal remedies, and to obscure Mr. White's need for medical care, treatment, and prescription medication.

62.    Following Mr. White's release from illegal solitary confinement, he continued to suffer and make his medical needs known. In or about April, 2011, for the first time since his imprisonment began, Mr. White's blood was drawn for medical testing. The Defendants caused harm and injury to Mr. White in the process of drawing his blood, and escalated harm and injury when the test results proved that he was being harmed and injured by the ongoing illegal withholding of

his needed prescription medications. The test results showed, among other problems, that Mr. White's PSA level, around 2 at the time his imprisonment began, had more than doubled to a dangerous level, as his medication was withheld and he was made to be a human medical experiment. Even upon the Defendants receiving and learning of Mr. White's test results indicating the need for urgent medical attention, the Defendants continued to fail and refuse to provide medical care and treatment, and they persisted in withholding his medication. Additionally and egregiously, the Defendants failed and refused to give the results to Mr. White.

63.    The Plaintiffs were ultimately able to obtain Mr. White's test results, despite the obstruction by the Defendants. Months passed as Mr. White's suffering grew, until the prison Defendants selected and arranged for a consulting urologist to see Mr. White. The Defendants' urologist examined Mr. White and prescribed that his pre-imprisonment medications be returned to him, yet the prison Defendants continued to fail and refuse to provide the needed medication prescribed by the specialist they themselves had chosen, exhibiting depravity and wantonness and causing Mr. White severe harm and injury, and outrage, along with Mrs. White. Mr. White's current PSA has risen to in excess of 5.3.

64.    Following Mr. White's illegal solitary confinement, he also exhibited symptoms of post traumatic stress disorder and had developed problems with his eyes. Requests for examination and treatment were summarily denied, with

Defendant Blocker telling Mr. White that PTSD and other medical trauma were common and expected of prisoners who had been in the SHU, even as it is a well known medical fact that untreated PTSD leads to permanent injury and disability.

65.    Requests for treatment of Mr. White's eye problems, which indicated the necessity of examination by a qualified ophthalmologist, were likewise ignored for some time. Eventually, the prison medical Defendants arranged for a visit by a Wal-mart optical department employee who, without even examining Mr. White, told him that based on his age, he needed bi-focals. The Wal-mart employee wrote a prescription for bi-focal eyeglasses, measured Mr. White's face and head, and left. Many weeks later, Mr. White was given a pair of eyeglasses that did not fit, with the arms not even reaching his ears. Balancing the eyeglasses on his nose and face, Mr. White could not use the eyeglasses, nor did they provide any benefit, nor did they address or resolve his worsening eye problems. The eyeglasses, paid for by tax dollars, were unusable, unused and eventually confiscated by prison employees in Millington, having provided no benefit to Mr. White whatsoever.

66.    Defendant Swanson, from September 29, 2010 through December 28, 2011, was the prison employee who worked in food service and who knowingly and wantonly prepared and caused to be served to Mr. White and other prisoners food products, including meat, poultry and fish, that had been long expired, food products, including meat, poultry and fish, that were labeled,

"CONTAMINATED" and "NOT FOR HUMAN CONSUMPTION" and food products, including grits and oatmeal, that had been and were contaminated with rat feces. Additionally, Defendant Swanson was known to have and operate a for-profit restaurant in town. Upon information and belief, Defendant Swanson had been discovered by prison employees on two or more occasions removing food from the prison food service area to his private automobile, resulting only in prison employees being told they could no longer have their automobiles in the loading area. Mr. White was told that an audit of the food service operation at the prison in 2011 revealed approximately one million dollars ($1,000,000.00) worth of food products missing and unaccounted for; spoiled and discarded food was accounted for and its disposal noted in the records so the figure was strictly for food products that had not been used, discarded, or disposed of.

67.     The prison Defendants failed and refused to exercise health and safe food handling rules, policies and procedures, thereby causing severe harm and injury to the Mr. White and the other prisoners. Throughout the period of September 29, 2010 through December 28, 2011, reusable food receptacles, cups, utensils, trays and other such items were placed after use in a dishwashing machine then rinsed – only rinsed – in warm or cold water, without the use of any cleaning products, detergent, sanitizer, or other such agents to clean and sanitize the items prior to reuse, thereby exposing Mr. White and the other prisoners to

contamination and cross-contamination through use of the items. Following said rinsing, the items were stacked and placed for reuse while still wet, in violation of health and safety rules. The prison Defendants knowingly allowed sick prisoners, including those with serious communicable illnesses, such as and including staph infections, to continue to work in the food service area, handling food products. The prison Defendants failed and refused to address a known rat infestation problem in the food service area, and continued to prepare and serve food products, including grits and oatmeal, in which rats and rat feces had been seen by prisoners and by prison employees. Only after Mr. White's complaints did the prison Defendants act, placing rat traps in the eating area where prisoners sat to eat their meals.

68.    Defendant Byrd engaged in harassing and abusive acts against both Mr. White and Mrs. White on the occasions of her visits to the prison to see her husband. Defendant Byrd, whose multiple drunk and disorderly arrests had been written about in the local media, including one arrest after discharging a firearm in a local restaurant while drunk at or about 10:30 a.m. on a Saturday morning then fleeing the scene before being caught and arrested by a state trooper, was on duty and refused to allow Mrs. White and other visitors to enter the building on or about Christmas Eve, 2011, compelling the visitors, including small children and elderly women, to remain standing outside in near freezing temperatures for approximately

45 minutes after visitation was scheduled to have begun, causing serious harm, injury and subsequent illness of Mrs. White. Defendant Byrd, on a separate occasion while Mrs. White was present visiting her husband, broadcast a threat to the prisoners over the prison's public address system.

69. Defendant Ingram, from September 29, 2010 through Mrs. White's last visit to her husband in Edgefield, engaged in a pattern and practice of harassing, threatening, intimidating, abusing and otherwise violating Mrs. White and her rights and privileges. Defendant Ingram complained to other visitors about Mrs. White's exercise of her First Amendment rights, referring at least one visitor to a website and stating, "She says I'm the devil." Defendant Ingram additionally defamed, libeled, and slandered Mrs. White on various occasions, including falsely claiming and reporting that Mrs. White was "visiting" with another prisoner and/or the other prisoner's visitor, resulting in a subsequent warning and threat to Mr. White, Mrs. White, the other prisoner and his wife.

70. Defendant Landy, from September 29, 2010 through Mrs. White's last visit to her husband in Edgefield, engaged in a pattern and practice of harassing, threatening, intimidating, abusing and otherwise violating Mrs. White and her rights and privileges. Defendant Landy singled out Mrs. White for harassment and abuse, including yelling at her – but only her – when numerous visitors were routinely compelled to shake the vending machines to obtain their purchases.

71.    Defendants Mitchell, Atkinson, Mackelburg, female Hollett and others were repeatedly informed and made aware of the violations committed against Mr. and Mrs. White; they also received dozens of written complaints, all of which were ignored and/or denied, as the Defendants failed and refused to fulfill their duties and responsibilities, investigate and/or properly report wrong-doing and corruption as required, and protect the rights and privileges of Mr. and Mrs. White, instead, actively engaging in the violations of those rights and privileges.

72.    Defendant Nettles was repeatedly made aware of the criminal acts and criminal corruption of the prison employee Defendants, including their criminal deprivation of civil rights under color of law against Mr. and Mrs. White; he failed and refused to fulfill his duties and responsibilities to act to protect the rights and privileges of Mr. and Mrs. White; he failed and refused to investigate their legitimate complaints and to prosecute the Defendants for their criminal acts.

73.    Each and every individual and entity with responsibility and/or oversight, when repeatedly made aware of the violations against the Whites, failed and refused to act to stop the violations, hold the Defendants accountable, and/or protect the Whites and the rights and privileges of the Whites, thereby acting against the interests of justice.

74.    Defendant Mahomes stated to Mr. White that he would recommend Mr. White's transfer to his home state of Alabama.    Instead, the Defendants

illegally and maliciously conspired and illegally and maliciously moved Mr. White to Atlanta, then to Oklahoma City, then to Memphis, then to Millington, Tennessee, over a period of eight days, causing severe harm and injury to him, subjecting him to unbearable and inhumane conditions, additional solitary confinement and sleep deprivation, causing severe contusions and bruising due to repeated days of being shackled and handcuffed for up to fourteen (14) hours per day, malnutrition, denial and deprivation of clean clothing and hygiene necessities, extended exposure to near-freezing temperatures and rain while being compelled to stand on the airport tarmacs for over an hour at a time with no outer wear and dressed in only underwear (briefs) and a thin paper jumpsuit. These acts constitute the intentional infliction of emotional distress as to both Mr. White and Mrs. White.

75.    During or about the month of December, 2011 alone, at least three (3) prisoners at Edgefield _**died**_ due to the willful medical abuse and withholding of medical care and treatment at the Prison, despite their repeated efforts and pleas for assistance. In or about the month of October, a known diabetic prisoner suffered gangrene and sepsis and was forced to endure multiple surgical amputations of his toes and foot and multiple lengthy hospitalizations resulting from the failure and refusal of the prison employee Defendants to provide care and treatment over approximately two years for a toenail infection, knowingly and willfully

withholding needed medication, care and treatment.  Mr. and Mrs. White have complained of and made known the gross pattern and practice of medical abuse by the Defendants at the Prison, which all Defendants have continued to ignore, to the detriment of the Plaintiffs and other prisoners and their families.  These acts are so severe as to shock the conscience of the Plaintiffs; no person should have to endure such abuse at the hands of the United States of American, its employees and agents, including federal judges who look the other way, ignoring their obligations and oath of office as well as the constitution and laws of the United States, to the extreme detriment of the Plaintiffs and other similarly situated human beings.

76.    Following Mr. White's illegal, sudden and abusive removal from the Prison, which occurred immediately following the dismissal of the aforementioned lawsuit and was likely intended to prevent and obstruct the Whites' access to and exercise of redress of their grievances through removing Mr. White from the jurisdiction in violation of their civil rights, the Defendants, including in particular but without limitation Defendant female Hollett, acted to prevent and withhold Mr. White from receiving his personal property and acted to prevent and withhold Mrs. White from receiving her personal property, being items Mr. White had directed to be sent to Mrs. White, allowing the prison employees to steal the personal property belonging to the Plaintiffs.  After weeks and months, some – but not all – of his personal property, including some of his legal materials, was finally given to Mr.

White, but those items intended for Mrs. White and belonging to her were knowingly and willfully blocked and prevented from being sent to her by Defendant female Hollett.

77.     Defendant Sunderman, in addition to committing other violations against the Whites causing them serious harm and injury, stated to his attorney that Mr. White was transferred at his request. Mr. White repeatedly requested transfer – but only to his home state of Alabama. Instead, in retaliation and abuse, Mr. White was transferred to Millington, Tennessee, the federal prison camp the furthest distance from his and Mrs. White's family's home allowing the Defendants to say he was moved closer to home. Edgefield is approximately 299 miles from the Plaintiffs' home; Millington is approximately 266 miles, a difference of 33 miles. There is no other federal prison camp less than 299 miles away and more than 266 miles away. Mr. White's requests for transfer to his home state have been denied and refused, to his detriment and the detriment of his wife, whose physical and medical conditions result in severe pain, harm and injury, and impose unbearable hardships, including financial hardships, on Mrs. White to visit Mr. White at such a far distance.

78.     In preparing this lawsuit, the Defendants, along with others intended to be made Defendants in actions in Tennessee, Alabama and possible other jurisdictions, have obstructed communications between the Plaintiffs, have denied

and deprived the Plaintiffs of legal calls, legal mail, legal visits and legal assistance.   As the Plaintiffs have been obstructed by the Defendants from communicating and conferring regarding the drafting of this Complaint, as well as other matters, Plaintiff are preserving by notice any and all rights, and tolling any and all statutes of limitations.   This Complaint is expected to be amended and consolidation will be sought in a different jurisdiction, due to the wrongful actions of court, judicial and other federal officials in South Carolina, as well as judicial economy, the limited resources of the Plaintiffs, the widespread violations by Defendants in numerous states and jurisdictions, which are all unbreakably linked and cause the Defendants named herein to be indispensable parties in other actions in other jurisdictions.   Neither of the Plaintiffs ever chose to be or consented to presence in South Carolina or Tennessee; both are resident citizens of the State of Alabama, where consolidation will be sought.   Additionally, Alabama is centrally located, being midway between Defendants in South Carolina and Tennessee.

## INCORPORATION OF COUNTS ONE THROUGH TWENTY-FIVE

79.   **CIVIL    ACTION    NO.    8:11-144-HMH-KFM    IS REINCORPORATED IN ITS ENTIRETY BY REFERENCE AS IF FULLY SET FORTH HEREIN, INCLUDING EACH AND EVERY ATTACHMENT, AMENDMENT,   MOTION,   AND   PLEADING,   AND   INCLUDING SPECIFICALLY   BUT   WITHOUT   LIMITATION,   COUNTS   ONE**

**THROUGH TWENTY-FIVE.**

80.     The Plaintiffs reallege and reassert each and every material allegation contained in each preceding paragraph and incorporate them by reference as if fully set out herein.

WHEREFORE the Plaintiffs demand compensatory and punitive damages and judgment against the Defendants and/or their agents in a sum to be determined by a jury but not less than the minimum jurisdictional limitations of this Court.

## COUNT TWENTY-SIX: CRIMINAL DEPRIVATION OF CIVIL RIGHTS UNDER COLOR OF LAW

81.     The Plaintiffs reallege and reassert each and every material allegation contained in each preceding paragraph and incorporate them by reference as if fully set out herein.

WHEREFORE the Plaintiffs demand compensatory and punitive damages and judgment against the Defendants and/or their agents in a sum to be determined by a jury but not less than the minimum jurisdictional limitations of this Court.

## COUNT TWENTY-SEVEN:  TOXIC TORTS

82.     The Plaintiffs reallege and reassert each and every material allegation contained in each preceding paragraph and incorporate them by reference as if fully set out herein.

83.    The Plaintiff Mr. White was from September 29, 2010 through December 28, 2011, exposed to toxic waste spillage and other potentially hazardous toxic exposure, the Defendants' intentional toxic tort.

WHEREFORE the Plaintiffs demand compensatory and punitive damages and judgment against the Defendants and/or their agents in a sum to be determined by a jury but not less than the minimum jurisdictional limitations of this Court.

## COUNT TWENTY-EIGHT: CONVERSION

84.    The Plaintiffs reallege and reassert each and every material allegation contained in each preceding paragraph and incorporate them by reference as if fully set out herein.

85.    The Defendants' actions is taking, withholding and keeping the personal property of significant value belonging to the Plaintiffs, including Mr. White's prescription medications that he was told by prison employees to bring with him when he self-surrendered and other personal property, is the intentional tort of conversion.

WHEREFORE the Plaintiffs demand compensatory and punitive damages and judgment against the Defendants and/or their agents in a sum to be determined by a jury but not less than the minimum jurisdictional limitations of this Court.

## COUNT TWENTY-NINE: TRESPASS TO CHATTEL

86.    The Plaintiffs reallege and reassert each and every material allegation contained in each preceding paragraph and incorporate them by reference as if fully set out herein.

87.    The wrongful acts of the Defendants in taking and holding the personal property of the Plaintiffs, including damage to and disappearance of Plaintiffs' property, and undue delay in giving the Plaintiffs their property is the intentional tort of trespass to chattel.

WHEREFORE the Plaintiffs demand compensatory and punitive damages and judgment against the Defendants and/or their agents in a sum to be determined by a jury but not less than the minimum jurisdictional limitations of this Court.

## COUNT THIRTY: FRAUD

88.    The Plaintiffs reallege and reassert each and every material allegation contained in each preceding paragraph and incorporate them by reference as if fully set out herein.

89.    The Defendants intentionally made false statements to induce the Plaintiffs to engage in certain conduct or give up something of value, thereby committing the intentional tort of fraud.

WHEREFORE the Plaintiffs demand compensatory and punitive damages and judgment against the Defendants and/or their agents in a sum to be determined by a jury but not less than the minimum jurisdictional limitations of this Court.

## COUNT THIRTY-ONE: MISREPRESENTATION

90.    The Plaintiffs reallege and reassert each and every material allegation contained in each preceding paragraph and incorporate them by reference as if fully set out herein.

91.    The Defendants intentionally made false statements and/or created false impressions with the intent to deceive the Plaintiffs, as well as other persons, thereby committing the intentional tort of fraud.

WHEREFORE the Plaintiffs demand compensatory and punitive damages and judgment against the Defendants and/or their agents in a sum to be determined by a jury but not less than the minimum jurisdictional limitations of this Court.

## COUNT THIRTY-TWO: OUTRAGE

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

92.    The Plaintiffs reallege and reassert each and every material allegation contained in each preceding paragraph and incorporate them by reference as if fully set out herein.

93.    As detailed hereinabove, the acts of the Defendants irrefutably establish their desire to cause the Plaintiffs emotional distress and/or the Defendants knew with substantial certainty that the Plaintiffs would suffer emotional distress resulting from their acts and/or the Defendants recklessly disregarded the high probability that the Plaintiffs would suffer emotional distress resulting from their acts, said acts including omissions, as the Defendants had and failed to fulfill duties and obligations to the Plaintiffs.  The Defendants engaged in extreme and outrageous conduct that was intended to cause and did, in fact, cause, severe mental anguish and distress in the Plaintiffs, such that no reasonable person or ordinary sensibilities would be expected or able to withstand under the circumstances without experiencing emotional distress and outrage.    The Defendants had actual knowledge and awareness of the fragile and highly sensitive natures and conditions of both Mr. White and Mrs. White, yet acted intending to cause them harm and injury, and in fact, causing them harm and injury from which each and both continue to suffer to date.

WHEREFORE the Plaintiffs demand compensatory and punitive damages and judgment against the Defendants and/or their agents in a sum to be determined by a jury but not less than the minimum jurisdictional limitations of this Court.

## COUNT THIRTY-THREE:  FALSE IMPRISONMENT

94.    The Plaintiffs reallege and reassert each and every material allegation contained in each preceding paragraph and incorporate them by reference as if fully set out herein.

95.    The Defendants subjected Mr. White to unlawful detention and restraint of his freedom of movement, without justification and without consent, for twenty-seven (27) days when he was illegally locked in the SHU, having committed no violation whatsoever, inflicting harm and injury, and committing the intentional tort of false imprisonment.

96.    The Defendants subjected Mr. White to unlawful detention and restraint of his freedom of movement, without justification and without consent, for each and every time he was shackled and/or handcuffed, inflicting harm and injury, and committing the intentional tort of false imprisonment.

97.    The Defendants subjected Mr. White to unlawful detention and restraint of his freedom of movement, without justification and without consent, from December 28, 2011 through January 4, 2012, subjecting him to barbaric conditions, inflicting harm and injury, and committing the intentional tort of false imprisonment.

98.    The Defendants subjected Mrs. White to unlawful detention and restraint of her freedom of movement, without justification and without consent, on or about January 18, 2011, when the Defendants locked Mrs. White in the visiting room at the Prison and refused her request to leave, inflicting harm and injury, and committing the intentional tort of false imprisonment.

WHEREFORE the Plaintiffs demand compensatory and punitive damages and judgment against the Defendants and/or their agents in a sum to be determined by a jury but not less than the minimum jurisdictional limitations of this Court.

## COUNT THIRTY-FOUR:  MALICIOUS ASSAULT AND BATTERY

99.    The Plaintiffs reallege and reassert each and every material allegation contained in each preceding paragraph and incorporate them by reference as if fully set out herein.

100.    The Defendants committed malicious assault and/or malicious assault and battery against the Plaintiffs, causing them fear and apprehension of harm and, in fact, committing harm and injury against them.

WHEREFORE the Plaintiffs demand compensatory and punitive damages and judgment against the Defendants and/or their agents in a sum to be determined by a jury but not less than the minimum jurisdictional limitations of this Court.

## COUNT THIRTY-FIVE:  VIOLATIONS AND DEPRIVATIONS OF

## CIVIL RIGHTS AND PRIVILEGES AND FEDERAL LAW

101.   The Plaintiffs reallege and reassert each and every material allegation contained in each preceding paragraph and incorporate them by reference as if fully set out herein.

102.   The Defendants' acts and omissions violated the Plaintiffs' rights and privileges under the United States Constitution; the Bill of Rights; federal law, including the C.F.R.; BOP rules, regulations and procedures, including Program Statements; and other statutory and case law established and intended to protect the Plaintiffs from the harm and injury wrongfully inflicted against them by the Defendants.

WHEREFORE the Plaintiffs demand compensatory and punitive damages and judgment against the Defendants and/or their agents in a sum to be determined by a jury but not less than the minimum jurisdictional limitations of this Court.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, the Plaintiffs pray that judgment be entered against the Defendants for:

(a) An award of actual damages;

(b) An award of statutory damages;

(c) An award of costs of litigation and reasonable attorney's fees;

(d) An award of actual damages from Defendants for all damages, in an amount to be determined at trial for the Plaintiffs;

(e) Punitive damages in an amount to be determined at trial for the Plaintiffs; and

(f) For such other, further, and different relief as may be just and proper and as may be within the jurisdiction of the Honorable Court to grant.

Respectfully submitted this 29th day of September, 2012.

## PLAINTIFFS DEMAND TRIAL BY STRUCK JURY

*Judy White*
**JUDY WHITE, Plaintiff**

*Gary White*
**GARY WHITE, Plaintiff**

PLAINTIFFS:
Judy White
Gary White
7032 Greenwood Lane
Leeds, Alabama  35094
(205) 870-4912 telephone